Filed 6/23/23  Tamamian v. Delgado CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JACK HAGOP TAMAMIAN,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>MAREK SOTO DELGADO,<br><br>Defendant and Respondent. | B317575<br><br>(Los Angeles County<br>Super. Ct. No. BC703639) |

Appeal from a judgment and an order of the Superior Court of Los Angeles County, Cary H. Nishimoto, Judge. Affirmed.

Feher Law, Thomas S. Feher, Andrew V. Alexandroff and Nahid A. McGlynn for Plaintiff and Appellant.

Ford, Walker, Haggerty & Behar, John K. Paulson, Emily T. Zinn and David J. Mendoza for Defendant and Respondent.

_____

In October 2016, Marek Delgado (Delgado) rear-ended Jack Tamamian (Tamamian) on the Interstate 210 freeway in Pasadena, California.  Tamamian reported no pain or injury at the time of the collision.  Two years later, he filed a personal injury suit against Delgado claiming that the accident triggered the onset of debilitating lower back and leg pain.  Following a two-week trial, the jury returned a verdict in favor of Delgado, concluding that the accident was not a substantial factor in causing Tamamian's alleged harm.  Tamamian then filed motions for judgment notwithstanding the verdict and for a new trial, both of which the trial court denied.

Tamamian now asks us to reverse the order denying his posttrial motions.  He contends that no evidence whatsoever supports the jury's verdict because all trial witnesses agreed that he suffered at least some harm in the collision.  He urges further that a host of purported trial errors—namely, improper cross-examination and closing argument by defense counsel, the erroneous admission of belatedly disclosed evidence, and error in reading back certain expert testimony to the jury—requires that we grant him a new trial.  We conclude, however, that substantial evidence supports the jury's verdict, and that any trial errors were harmless.  We therefore affirm.

**FACTUAL SUMMARY AND PROCEDURAL HISTORY[1]**

### A.  *The Accident*

At approximately 8:00 a.m. on Saturday, October 1, 2016, Delgado, driving a Cadillac sedan, rear-ended Tamamian, who was driving a Toyota Tacoma.  The collision was minor enough

---

[1] We summarize here only the facts and procedural history relevant to our resolution of this appeal.

that the parties did not call the police. Instead, Delgado and Tamamian each exited their vehicles, exchanged information, and then returned to their cars and drove away from the accident site.

Tamamian did not report any pain or injury at the time of the collision, and he drove to work at Speedy Radiator—an auto body shop where he services radiators—immediately following the accident. He worked a half day, consistent with his typical Saturday schedule. Tamamian's radiator repair work, which he has performed for over 35 years, is physically demanding. The job requires that he slide underneath cars and remove radiators from vehicles.

### B. *The Initial and Supplemental Repair Estimates*

On November 15, 2016, a month and a half after the collision, Tamamian obtained a repair estimate for the damage to his truck. The estimate totaled $1,651.10 and called for, inter alia, the repair of the truck's bumper and tailgate. The estimate did not identify any frame damage to the vehicle.

Tamamian received the funds necessary to complete the repairs to his truck, but elected not to do so. Instead, he continued driving the truck in its postaccident condition for three years.

On September 6, 2019—nearly three years after the initial estimate and more than a year after filing the complaint in this action (discussed *post*)—Tamamian obtained a supplemental repair estimate for his truck. This second estimate was significantly higher, identifying $4,176.73 in necessary repairs. In contrast to the initial repair estimate, the supplemental estimate indicated that the truck had sustained frame damage.

### C.    *Tamamian's Medical Treatment*

Tamamian first sought medical treatment for lower back pain three days after the October 1, 2016 collision.  He went to urgent care, where medical personnel gave him a shot for the pain and referred him to a chiropractor.  The chiropractor treated Tamamian for several months in 2016 and 2017.

Because Tamamian indicated that his lower back pain had not improved, the chiropractor referred him to Dr. Stepan Kasimian, an orthopedic surgeon.  Seventy percent of Dr. Kasimian's practice is "lien-based care," meaning that, for patients who are personal injury plaintiffs, Dr. Kasimian agrees the patients may defer paying for his medical services until their personal injury actions have resolved.  Dr. Kasimian agreed to treat Tamamian on a lien basis.

Dr. Kasimian performed an initial examination of Tamamian on December 18, 2017, and a second examination on February 5, 2018.  Tamamian indicated he was experiencing pain in his lower back and the entirety of his right leg, in addition to numbness in the toes on his left foot.  Dr. Kasimian ordered an MRI for Tamamian, as well as a nerve test and x-rays.

Based on the results of these tests and Tamamian's reported symptoms, Dr. Kasimian referred him to Dr. Lawrence Miller, a pain management physician who practices with Dr. Kasimian's medical group.  Dr. Miller concluded that Tamamian's other medical conditions—which included diabetes, kidney stones, and prior colon cancer—made him a poor candidate for an epidural steroid injection, a nonsurgical option designed to mitigate back pain.  At some point between February and July 2018, Dr. Kasimian therefore recommended that Tamamian undergo lumbar decompression surgery.

4

Tamamian, however, initially decided against surgery and for the next two years limited his treatment to home exercises. Tamamian continued working at Speedy Radiator throughout this time period. Not until February 2, 2020—more than three years after the collision and nearly two years after Tamamian filed his personal injury claims against Delgado—did he decide to undergo the surgery. Dr. Kasimian charged Tamamian approximately $41,600 for the procedure.

Following the surgery, Tamamian experienced some temporary relief of his symptoms, but within a few months his lower back pain returned, accompanied by new pain radiating down his left leg. Dr. Kasimian therefore recommended a "revision surgery," during which he would insert a cage into Tamamian's spine in an effort to relieve pressure on the nerve located at the L5-S1 vertebrae. As of the time of trial in this action, Tamamian had not yet scheduled the revision surgery.

### D.    *Trial Proceedings*

On April 24, 2018, Tamamian filed a complaint against Delgado in connection with the October 1, 2016 collision.[2] Tamamian and his wife, Aida Starr Tamamian (Aida), then filed a first amended complaint on June 20, 2018. The amended complaint asserted causes of action for motor vehicle negligence and general negligence on behalf of Tamamian, as well as a loss of consortium claim on Aida's behalf. On November 26, 2019, Aida dismissed her loss of consortium claim, leaving Tamamian as the sole plaintiff in the action.

---

[2] In addition to Delgado, the complaint named the owner of the vehicle as a defendant. The trial court subsequently granted a judgment of nonsuit as to the owner, and he is not a party to this appeal.

5

The case proceeded to jury trial in September 2021. Delgado conceded negligence, but disputed causation and damages. Over the course of the two-week trial, Tamamian presented testimony from Aida and his son, Vartan Tamamian (Vartan), concerning how his lower back pain had impacted his quality of life. In addition, Tamamian testified on his own behalf.

Tamamian did not call his chiropractor or his urgent care doctor as trial witnesses. He did, however, present testimony from Dr. Kasimian, Dr. Miller, and two other medical experts—neurosurgeon Dr. Andrew Fox and neuroradiologist Dr. Brian King—in support of his claims that the collision caused his lower back and leg pain. Tamamian's medical experts explained that, prior to the accident, Tamamian likely had preexisting degenerative changes in his back, including a herniated disc and narrowing of his spinal nerve pathway. They opined, however, that the collision served as a catalyst for Tamamian's symptoms. Dr. Fox, for example, likened Tamamian's condition to an aneurysm:

"So I equate this as a neurosurgeon it's like having an aneurysm. You can have an aneurysm and it's asymptomatic but all of a sudden you have change in pressure, that aneurysm ruptures. . . . So [Tamamian] has an underlying pathology but [it was] asymptomatic and he didn't know about becoming symptomatic until he had an event which caused him to become symptomatic."

In addition to medical experts, Tamamian presented testimony from Brian Smith, a biomechanics expert, concerning the forces generated by the collision.

During the defense case, Delgado called as a witness Dr. Missak Klitchian, Tamamian's family physician, who testified

6

that Tamamian visited him only infrequently and had not adequately controlled his diabetes for five or 10 years.

Delgado also offered testimony from his own medical experts—neuroradiologist Dr. Rachel Gordon and neurosurgeon Dr. Luke Macyszyn—who opined that the accident did not cause Tamamian's lower back and leg pain. Dr. Gordon explained, based on a comparison of a 2012 CT scan of Tamamian's abdomen with his postaccident MRI films, that Tamamian had had "a pretty degenerative back" since "at least . . . 2012," and noted that she saw no evidence of trauma-based injuries. Dr. Macyszyn testified further that the "most reasonable and straightforward explanation[s] for [Tamamian's] symptoms of . . . feeling numbness in his legs" were his diabetes and the chemotherapy he had received to treat his colon cancer.

In addition, Delgado presented testimony from his own accident biomechanics expert, Daniel Voss, as well as from an expert in medical billing, Henry Lubow, who testified that Dr. Kasimian's charges for the surgery were unreasonably high.

Tamamian did not present any rebuttal witnesses. In closing argument, he asked the jury to award him over $350,000 for medical expenses and to award between $2 and $4 million to compensate him for past and future noneconomic harm resulting from the accident.

Over the course of their day-long deliberations, the jurors made several requests. As relevant here, the jury asked "to hear Dr. King's testimony regarding flare-up—(II exam) and his cross-examination." In response, the trial court permitted a readback to the jury of Dr. King's cross-examination. Approximately an hour after the readback, the jury returned a 9 to 3 verdict for the defense, indicating on the special verdict form its conclusion that

7

Delgado's negligence was not "a substantial factor in causing harm to [Tamamian]."

Tamamian subsequently filed a motion for judgment notwithstanding the verdict and for a new trial. The trial court denied both motions at a December 10, 2021 hearing, explaining in relevant part:

"The thing that I think [Tamamian] missed is that the optics of this case did not sit well with the jury. We're talking about a rear-end accident that ultimately there was evidence that [the car] wasn't even damaged. And yet there were two—two damage estimates, but [Tamamian] continued to drive the car for three years. How could anyone drive a vehicle at all, much less for three years, if it's got frame damage? . . . After the accident [Tamamian] continued on with his daily activities. . . . And [he] was not asking the jury for three months of—of medicals. [He was] asking for medicals based on $120,000 worth of medical treatment of which the jury could easily have concluded that the $46,000 that Dr. Kasimian charged for his surgery was unnecessary. Either that or it was merely a—a surgery to correct what was a preexisting injury. . . . The jury is entitled to disregard expert witnesses. . . . And I think this entire case boils down to the issue of credibility of [Tamamian] and his wife. . . . So I—I think that the tentative rulings are correct and those will be the order."

Tamamian timely appealed.

## DISCUSSION

### A. The Trial Court Properly Denied Tamamian's Motion for Judgment Notwithstanding the Verdict

"On appeal from an order denying a motion for judgment notwithstanding the verdict, our standard of review . . . is 'whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion.' [Citation.] We may not reweigh evidence or consider witnesses' credibility. [Citation.] Rather, we view the evidence in the light most favorable to the jury's verdict, we disregard conflicting evidence, and we draw all legitimate inferences in favor of the verdict." (*Morgan v. J-M Manufacturing Co., Inc.* (2021) 60 Cal.App.5th 1078, 1085 (*Morgan*).)

Tamamian does not dispute that he bore the burden at trial of demonstrating that the collision was a "substantial factor" in causing his alleged harm—namely, his lower back and leg pain, along with the loss of enjoyment of life that he contends resulted from that pain. (See *Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1014 (*Crouch*).) Nor does he contend that the trial court misinstructed the jury concerning the definition of "substantial factor."[3] Instead, Tamamian contends that no evidence whatsoever supports the jury's determination that the collision was not a substantial

---

[3] The court instructed the jury, using CACI No. 430, that "[a] substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct."

9

factor in causing his alleged harm because "*all witnesses agreed* that [he] had an onset of low back pain following the October 1, 2016 motor vehicle collision—and that [his] pain was *caused* by the subject collision." At a minimum, Tamamian urges, the defense expert witnesses agreed that he suffered a lower back muscle strain as a result of the accident.

The record belies Tamamian's contentions. As an initial matter, no defense expert offered an opinion that Tamamian "had an onset of low back pain" following the collision. The testimony on which Tamamian relies for this argument consists merely of the defense experts' confirmation (on cross examination) of the contents of Tamamian's deposition transcripts and medical records—materials the experts had no hand in preparing.[4] Such testimony does not constitute agreement by the defense experts that Tamamian in fact experienced pain following the collision or that the accident caused his pain.

Moreover, Tamamian ignores testimony from each of Delgado's experts expressly disavowing that the collision triggered his pain. Dr. Gordon testified that Tamamian's 2012 CT scan and postaccident MRI films indicated that he had had "a pretty degenerative back" since "at least . . . 2012," and that the films contained no evidence of trauma-based injury to his

---

[4] For example, Tamamian points to the following testimony from Dr. Gordon:

"[Plaintiff's counsel:] All right. And in your review of this information, you understand that . . . Tamamian's symptoms of low back pain and radicular symptoms started after the October 1st, 2016 collision; correct?

"[Dr. Gordon:] That was what was in his medical records, yes."

spine. Dr. Macyszyn opined similarly, testifying that, to the extent Tamamian suffered any injury in the collision, it would have been "at most" a minor back strain:

"Once again, when I reviewed all these records, and, you know, obviously there's a lot of them, you know, I see you know an older patient who has degenerative disease in [the] lumbar spine. There was a very minor accident that occurred. Patient continued to go to work the following day or the following week, continued to work physically in a laborious job. [He] [d]id not require treatment for, you know, three to four years. To me this was a minor injury that *at most* led to a musculoligamentous strain, so like a back strain that all of us have experienced at some point that self-resolved. And the rest of the stuff is unrelated to this, once again, minor accident." (Italics added.)

Finally, although Voss, the defense biomechanics expert, testified that the forces generated by the collision could affect a human body by causing a "sprain [or] strain[,] particularly in the neck [or] upper back," he also testified that a person's lower back—the area Tamamian contends he injured in the accident—would be "well supported" in such a collision. And Voss testified further that the "force in th[e] collision would be significantly less than the force involved in" the activities of "daily living," such as "simply bending over."

Accordingly, we conclude that the trial record contains substantial evidence supporting the jury's finding that the accident was not a substantial factor in causing Tamamian's alleged harm. The trial court therefore properly denied Tamamian's motion for judgment notwithstanding the verdict. (See *Morgan*, *supra*, 60 Cal.App.5th at p. 1085.)

11

### B. The Trial Court Acted Within Its Discretion in Denying Tamamian's Motion for a New Trial

" 'An order denying a motion for new trial will not be set aside unless there was an abuse of discretion that resulted in prejudicial error.' [Citation.] We accord great deference to the trial court's exercise of its wide discretion in ruling on a motion for a new trial. [Citation.] In reviewing an order denying a motion for a new trial, we review the entire record, including the evidence, and independently determine whether any error was prejudicial." (*Crouch*, *supra*, 39 Cal.App.5th at p. 1018.) A trial court's decision regarding the admission of evidence is also reviewed for abuse of discretion. (*Meeks v. AutoZone, Inc.* (2018) 24 Cal.App.5th 855, 861, 867 (*Meeks*).)

Here, Tamamian contends that he is entitled to a new trial because (1) the court erroneously permitted defense counsel to examine various witnesses on allegedly improper topics, (2) the court erred in admitting evidence of Tamamian's 2012 CT scan and by permitting Dr. Gordon to offer new opinions related to the scan, (3) defense counsel made improper closing arguments, and (4) the trial court erred by reading back to the jury only Dr. King's testimony on cross-examination, rather than the entirety of his testimony. As detailed below, each of Tamamian's arguments fails.

#### 1. *Allegedly Improper Examination Topics*

##### a. *Aida's loss of consortium claim and her employment as a paralegal*

Tamamian first contends that the trial court erred by permitting defense counsel to cross-examine Aida concerning her dismissed loss of consortium claim and her employment as

a paralegal at HG Law—a law firm that previously represented Tamamian in this case. We disagree.

Tamamian's insistence that such testimony "provides zero probative value" because it "does not tend to prove or disprove the severity or extent of [his] injuries" ignores that defense counsel is entitled to probe a witness's credibility. (See *Newman v. Los Angeles Transit Lines* (1953) 120 Cal.App.2d 685, 691 ["[A] witness may be required to answer any question which tends to test [her] accuracy, veracity or credibility and especially in the case of a party to the action where [she] appears as a witness. [Citation.] Great latitude should be allowed in developing the existence of bias. [Citation.] Liberal cross-examination is the rule."].) Aida's employment as a paralegal at a law firm that once represented her husband, as well as her status as a former party to the action, were relevant to the jury's assessment of her credibility because these factors might have affected the nature and content of her trial testimony.

Moreover, Tamamian offers no legal authority in support of his contention that cross-examining Aida on these topics resulted in undue prejudice. The two cases on which he relies do not address the propriety of examining witnesses concerning their employment status or regarding dismissed claims. (See *Richard v. Scott* (1978) 79 Cal.App.3d 57; *Holling v. Chandler* (1966) 241 Cal.App.2d 19.) We therefore are unpersuaded that a new trial is warranted on this basis.

### b. *Aida's and Vartan's prior personal injury claims*

Next, Tamamian insists that we must grant him a new trial because defense counsel improperly questioned Aida and Vartan concerning their involvement in prior, unrelated personal injury litigation. Again, we disagree.

Although Tamamian contends there is "a plethora of case law" in support of his position, he points to only two cases, neither of which concerns the permissibility of cross-examining nonparty witnesses concerning their involvement in prior litigation: *Downing v. Barrett Mobile Home Transport, Inc.* (1974) 38 Cal.App.3d 519 (*Downing*) and *Lowenthal v. Mortimer* (1954) 125 Cal.App.2d 636 (*Lowenthal*).

In *Downing*, the Fourth Appellate District held that a trial court erred in permitting the introduction of a party's involvement in another accident because "[g]enerally, evidence that a litigant was involved in a prior accident is inadmissible when its only purported relevance is to show a propensity for negligent acts." (*Downing*, *supra*, 38 Cal.App.3d at p. 524.) *Downing* thus does not address the issue relevant here—namely, the propriety of admitting evidence of a witness's involvement in prior *litigation*.

*Lowenthal* lends more support to Tamamian's position, but still is not dispositive of the issue. In *Lowenthal*, the defendant rear-ended the plaintiffs, a husband and wife who owned a delicatessen. (*Lowenthal*, *supra*, 125 Cal.App.2d at p. 638.) "On cross-examination[,] [the wife] testified that their business required a cheerful person behind the counter, that after the accident her husband was irritable, [and] that this caused them to worry about being able to resume their business." (*Id.* at p. 639.) Purportedly to offer another explanation for the husband's " 'irritability,' " defense counsel proceeded to cross-examine plaintiffs concerning their involvement in 15 prior commercial lawsuits "wholly unrelated to personal injuries." (*Id.* at p. 640.) The *Lowenthal* court held that the trial court erred in permitting this line of questioning, explaining: "Introduction of the element of 15 other lawsuits could have had

14

no effect other than to prejudice the jury against the plaintiffs. For litigiousness, in the eyes of most people, reflects more upon character than upon impairment of health." (*Id.* at p. 642.)

Tamamian concedes that *Lowenthal* does not address the propriety of cross-examining a nonparty witness (as opposed to a party) concerning involvement in prior personal injury litigation, but he insists that "[i]f a party's litigation history is irrelevant, it is the undeniable proposition that a nonparty witness's litigation history is similarly irrelevant."

We need not resolve this issue because—even assuming the court erred in permitting cross-examination concerning prior personal injury actions—Tamamian has failed to demonstrate prejudice. The record does not support Tamamian's contention that defense counsel spent "countless hours with several witnesses on the . . . topic" of prior litigation. Indeed, Tamamian identifies only two limited instances of questioning on the topic: approximately two pages of transcripts from the cross-examination of Vartan and another two pages of transcripts from the cross-examination of Aida.

In addition, the testimony that defense counsel elicited from Vartan and Aida was not analogous to the prejudicial revelation in *Lowenthal* that plaintiffs had been involved in *15* prior lawsuits. (*Lowenthal*, *supra*, 125 Cal.App.2d at pp. 639–640.) Vartan testified that he had filed a personal injury suit only once before, in connection with a hip injury, and that he had previously filed one workers' compensation claim in connection with a lower back injury. Aida testified that she similarly had filed a personal injury suit only once, after being hit by a drunk driver. Particularly in light of plaintiff's counsel's argument emphasizing that Tamamian had "never filed a lawsuit before or any kind of claim," Tamamian has failed to

15

demonstrate that defense counsel's limited cross-examination of Aida and Vartan on the topic resulted in prejudice. (See *Crouch, supra*, 39 Cal.App.5th at p. 1018.)

### c. *Two repair estimates*

Finally, we are not persuaded that defense counsel's questioning of witnesses concerning the two repair estimates for Tamamian's truck requires a new trial here.

Tamamian first argues that the court erred in permitting any evidence of two separate estimates because "[t]he process of two repair estimates is standard, ubiquitous, and not suggestive of fraud or any ulterior motives," and "[t]he [c]ourt failed to appreciate the commonality of two repair estimates being performed." At trial, however, Tamamian admitted that it is "uncommon" for a supplemental repair estimate to take place three years following the initial estimate.[5] We therefore agree with the trial court's conclusion that "why [Tamamian] would ask for the vehicle to be repaired three years" after the collision arguably "calls into question his credibility." The court therefore did not abuse its discretion in permitting evidence of the two repair estimates. (*Meeks, supra*, 24 Cal.App.5th at p. 861.)

Tamamian next contends that—even if the court did not err in admitting evidence of the two estimates—defense counsel violated a stipulation and trial court rulings concerning the scope of permissible questioning by examining "multiple witnesses" on the topic for "[m]ultiple hours" in a manner designed to

---

[5] We note further that, although he did not testify at trial, Farmers Insurance's person most knowledgeable confirmed at deposition that a three-year delay between initial and supplemental repair estimates is "unusual."

16

"insinuate fraud" and attorney involvement in the supplemental repair estimate.  (Italics omitted.)

The record does not contain any stipulation between the parties on the topic.[6]  Tamamian is correct, however, that the trial court instructed defense counsel not to reference attorney involvement in obtaining the supplemental estimate and not to intimate fraud.

We disagree that defense counsel ran afoul of the court's rulings by "spen[ding] hours questioning witnesses about the two repair estimates."  The record does not support this contention.  Tamamian identifies only 13 lines of transcripts from the two-week trial that he claims constituted improper questioning on the topic.

But we agree with Tamamian that this testimony does reflect that defense counsel arguably violated the court's rulings by suggesting attorney involvement in obtaining the supplemental estimate:

"[Defense counsel:]  If your law firm was representing your husband in 2019, you would have been representing him at the time of that [*sic*] second vehicle repair estimate was performed, correct?

"[Aida:]  Yes.  I believe so.

"[Defense counsel:]  Okay.  And so who arranged for this second inspection in September 2019 to take place?

"[Aida:]  I don't recall.

"[Defense counsel:]  Okay.  Whose idea was it?

"[Aida:]  What do you mean?

---

[6] The portion of the record to which Tamamian cites reflects only that his own counsel proposed such a stipulation.  We see no indication that defense counsel agreed to the proposal.

17

"[Defense counsel:] Whose idea was it to go get a second inspection done?

"[Aida:] It was not a second inspection."

In our view, defense counsel's questions skirted—rather than outright flouted—the trial court's prohibition on referencing attorney involvement in obtaining the supplemental estimate. Even assuming, however, that defense counsel violated the trial court's rulings, we are not persuaded that the " 'misconduct . . . was sufficiently egregious to cause prejudice.' " (*Fernandez v. Jimenez* (2019) 40 Cal.App.5th 482, 494 (*Fernandez*).) Our determination " ' "ultimately rest[s] upon [our] view of the overall record, taking into account such factors, inter alia, as the nature and seriousness of the remarks and misconduct." ' " (*Id.* at p. 494.)

Viewed in the context of the entire trial record, defense counsel's four questions arguably suggesting attorney involvement in the supplemental repair estimate were harmless. The jury did not hear any direct evidence of attorney involvement in the repair estimate process; to the contrary, Aida testified that she did not know who arranged for the supplemental estimate. Moreover, Tamamian elicited testimony from his own biomechanics expert aimed at demonstrating the ubiquity of supplemental repair estimates.

Accordingly, we conclude that any error resulting from defense counsel's inquiries concerning attorney involvement in the supplemental repair estimate was harmless.

### 2. *2012 CT Scan and Dr. Gordon's New Opinions*

Next, Tamamian contends that we must grant a new trial because the court abused its discretion by (1) admitting into

18

evidence a 2012 CT scan of his abdomen,[7] and (2) permitting Dr. Gordon to testify that (a) all people have back pain, and (b) Tamamian must have had pain prior to the collision—opinions that Tamamian contends Dr. Gordon never offered in deposition.

As an initial matter, Tamamian has forfeited these contentions on appeal by failing to support his arguments with adequate citations to the record. (See Cal. Rules of Court, rule 8.204(a)(1)(C) ["[e]ach brief must . . . [¶] . . . [¶] . . . [s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"]; *Liberty National Enterprises, L.P. v. Chicago Title Ins. Co.* (2011) 194 Cal.App.4th 839, 846 ["We look askance at this practice of stating what purport to be facts—and not unimportant facts— without support in the record. This is a violation of the rules, specifically rule 8.204(a)(1)(C) of the California Rules of Court, with the consequence that such assertions will, at a minimum, be disregarded."].)

Moreover, even if considered on their merits, Tamamian's contentions fail. As to the 2012 CT scan, Tamamian argues that defense counsel impermissibly subpoenaed the scan from Hill Medical Corporation after the close of discovery, and that after he moved to quash the subpoenas, defense counsel misrepresented that they had withdrawn them. He urges further that the trial court prohibited him from addressing the scan in his case in chief. Nothing in the record supports these assertions. Tamamian appears to have confused subpoenas Delgado issued to Huntington Memorial Hospital—which Tamamian *did* move to

---

[7] The record reflects that the trial court did not, in fact, admit the 2012 CT scan into evidence, but the court did permit its use as a demonstrative and allowed Dr. Gordon to testify concerning the scan.

19

quash—with subpoenas issued to Hill Medical Corporation, the entity that produced the 2012 CT scan. And we see no indication that the trial court ruled that Tamamian could not address the scan during his case in chief.

With respect to Dr. Gordon's trial testimony, the record discloses that defense counsel informed Tamamian on August 3, 2021—more than a month before trial—that Dr. Gordon had formulated new opinions, offered to make her available for a second deposition, and offered to cover the cost of that deposition. Defense counsel also offered to provide an expert report in lieu of testimony. Tamamian failed to respond to these offers. Instead, he waited until September 3, 2021 to file a motion in limine to exclude Dr. Gordon's testimony, which the trial court denied during a September 15, 2021 hearing. At that same hearing—held two days before the start of jury selection—the trial court denied Tamamian's subsequent request to redepose Dr. Gordon, reasoning: "Counsel previously were given the opportunity to depose said expert, and declined." On this record, we cannot conclude that the trial court abused its discretion in permitting Dr. Gordon to offer new opinions at trial. (See *Easterby v. Clark* (2009) 171 Cal.App.4th 772, 780 [trial court committed reversible error in striking expert trial testimony not previously offered at deposition, where counsel provided notice of expert's changed opinions three months prior to trial].)

### 3. *Purportedly Improper Closing Arguments*

Next, Tamamian contends that we must grant a new trial because defense counsel made improper closing arguments by (1) asserting, purportedly without evidentiary support, that Tamamian had preexisting lower back pain, and (2) commenting

20

on Tamamian's failure to call his chiropractor and urgent care doctor as trial witnesses.  We disagree with both arguments.

Contrary to Tamamian's contention, the record does contain at least some evidence supporting defense counsel's argument in closing that it was "not reasonable" for "[a] 60-year-old gentleman who has been working replacing radiators for over 30 years . . . [to] ha[ve] no back pain."  Tamamian's 2012 CT scan reflects that he had significant, degenerative changes in his spine at least four years prior to the accident, and he worked for more than 30 years repairing radiators—a physically demanding job that Tamamian's own expert witnesses conceded could impact his spine health.

And we conclude that any error[8] by defense counsel in commenting on Tamamian's failure to call his chiropractor or urgent care physician was harmless.  The comment of which

_____

[8] Tamamian contends that long-standing caselaw holds that such comments were impermissible.  (See *Smith v. Covell* (1980) 100 Cal.App.3d 947, 956–957 ["Defense counsel in his rebuttal argument commented on plaintiffs' failure to call as witnesses the doctors . . . who had treated [one plaintiff] for injuries sustained in the accident; the implication was that such doctors would have testified adversely to plaintiffs' case." "[That] conduct was prejudicial in an unmeasured amount but adds support to the conclusion that reversal and retrial of the issue of damages is mandated."]; *Patton v. Royal Industries, Inc.* (1968) 263 Cal.App.2d 760, 769.)  Delgado counters that Tamamian ignores more recent authority from our Supreme Court.  (See *People v. Gonzales* (2012) 54 Cal.4th 1234, 1275 ["it is neither unusual nor improper to comment on the failure to call logical witnesses"].)  We need not resolve this issue, in light of our conclusion that any such error was harmless.

Tamamian complains is limited to six lines of transcripts[9] in a closing argument spanning more than 25 pages. Moreover, the jury heard from Tamamian's treating physicians Dr. Kasimian and Dr. Miller, as well as two other medical experts, all of whom provided testimony in support of Tamamian's assertions that he experienced severe back and leg pain as a result of the collision. Accordingly, we conclude that defense counsel's arguments were harmless. (See *Fernandez*, *supra*, 40 Cal.App.5th at p. 492.)

### 4. *Readback of Dr. King's Cross-Examination Testimony*

Finally, Tamamian argues that the trial court reversibly erred by permitting a readback to the jury of only the cross-examination of Dr. King, Tamamian's neuroradiology expert, rather than the entirety of his testimony. Although Tamamian argues there was "a good-faith dispute as to what testimony the jurors wanted to be read back," he provides no citations to the record substantiating such a dispute. Nor does Tamamian point to any legal authority in support of his contention that reading back only the portion of a witness's testimony requested by the jury is unduly prejudicial. (Contra *Asplund v. Driskell* (1964) 225 Cal.App.2d 705, 714 ["[I]t is not the party to whom the law gives the right to *select* testimony to be read. And the law does not make the party or his attorney the arbiter to determine the jury's wishes."].) We therefore are not persuaded that a new trial is warranted on this basis.

---

[9] Defense counsel argued: "So let's get to the specifics. Did we hear from the chiropractor? No. Did we hear from the urgent care doctor? No. We called his primary care physician. We didn't hear from the owner of the premises. Now, in this case, if the chiropractor was crucial, why didn't we hear from him?"

## DISPOSITION

We affirm the October 5, 2021 judgment entered following the jury trial, as well as the trial court's December 10, 2021 order denying Tamamian's motions for judgment notwithstanding the verdict and for a new trial. Respondent Delgado is awarded his costs on appeal.

NOT TO BE PUBLISHED.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

WEINGART, J.